**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DEUTSCHE BANK AG, LONDON BRANCH, <br><br> Plaintiff, <br><br> v. <br><br> FINEPOINT CAPITAL LP, WARBLER RUN I, LLC, and WARBLER RUN II, LLC, <br><br> Defendants. | Case No. 24-cv-04567 |

## COMPLAINT

Plaintiff Deutsche Bank AG, London Branch ("Deutsche Bank"), by and through its undersigned counsel, hereby files this Complaint against Defendants Finepoint Capital LP ("Finepoint"), Warbler Run I, LLC ("Warbler Run I"), and Warbler Run II, LLC ("Warbler Run II," and collectively with Finepoint and Warbler Run I, "Defendants").

## NATURE OF THE ACTION

1.      This is an action for breach of contract and breach of the implied covenant of good faith and fair dealing.

2.      The parties in this action entered into a trade nearly six years ago in which Defendants agreed to acquire from Deutsche Bank claims against the bankruptcy estate of Lehman Brothers Holdings, Inc., with a face amount of $906 million, in return for a purchase price of approximately $14.6 million (the "Trade").

3.      At the time the parties executed written trade confirmations memorializing the Trade, the terms had been thoroughly discussed and agreed upon; Defendants fully understood what they were buying; and, consistent with customary practice, the parties intended to settle the Trade after the execution of assignments of claim, pursuant to which Deutsche Bank would assign Defendants the purchased assets and Defendants would pay Deutsche Bank the agreed-upon price.

4.      But, for more than five years, Defendants have frustrated the parties' ability to settle the Trade by unreasonably refusing to execute an assignment of claim unless it includes either: (i) *literally impossible* representations and warranties, which would be breached the moment the assignment was signed, which is obviously not something Deutsche Bank agreed to when it entered into the Trade; or (ii) idiosyncratic indemnification language that goes well beyond what the parties agreed to when they agreed to the Trade.

5.      Deutsche Bank has spent the past five years attempting to resolve this issue without litigation, but to no avail.  Deutsche Bank is now left with no option but to pursue legal action to hold Defendants to their contractual obligations.

## PARTIES

6.      Deutsche Bank AG is a joint stock corporation incorporated with limited liability in the Federal Republic of Germany.  Its registered business address and principal place of business are both located in Frankfurt, Germany.

7.      Deutsche Bank AG, London Branch is a registered branch of a foreign company (*i.e.*, Deutsche Bank AG) in the register of companies for England and Wales.  Its registered business address and principal place of business are both located in London, United Kingdom.

8.      Defendant Finepoint Capital LP is a Delaware limited partnership with its principal place of business in Boston, Massachusetts.

9.      Defendant Warbler Run I, LLC, is a Delaware limited liability company with its principal place of business in Boston, Massachusetts.

10.      Defendant Warbler Run II, LLC, is a Delaware limited liability company with its principal place of business in Boston, Massachusetts.

## JURISDICTION AND VENUE

11.      The Court has subject-matter jurisdiction over this dispute pursuant to 28 U.S.C.

1332 because there is complete diversity of citizenship between the parties and the amount in controversy exceeds $75,000.

12.    The Court has personal jurisdiction over Defendants because Defendants specifically and repeatedly directed their activities to New York, availed themselves of the protection of New York laws, and consented to jurisdiction before this Court.

13.    Specifically, this dispute arises from a Trade that was negotiated in New York and memorialized in agreements that contain "choice-of-law" provisions stating that they must be "construed in accordance with the laws of the State of New York, without regard to any conflicts of law provisions," and further provide that "[a]ny controversies" between the parties "will be determined in the United States District Court for the Southern District of New York located in the County of New York."

14.    Pursuant to 28 U.S.C. 1391, this Court is the proper venue for this action because a substantial part of the events, omissions, and acts giving rise to the claims herein arose in this judicial district.

## FACTUAL ALLEGATIONS

### A.  The Lehman Bankruptcy, and the Secondary Marketplace for Claims Against Lehman's Estate

15.    On September 15, 2008, Lehman Brothers Holdings, Inc. ("Lehman"), which at the time was the fourth-largest investment bank in the United States, filed a petition for bankruptcy under Chapter 11 of the United States Bankruptcy Code.

16.    The Lehman bankruptcy filing remains the largest bankruptcy filing in the history of the United States.  On the day it filed its petition, Lehman held approximately $639 billion in assets and owed approximately $619 billion in liabilities.

17.    Unsurprisingly, given the unprecedented amount of assets to be distributed, and the

similarly unprecedented number of claims on Lehman's estate requiring resolution, the liquidation of Lehman's estate has been a long and arduous process.  To this day, the liquidation proceeding is still underway, with partial payments on thousands of claims continuing to be distributed every six months.

18.     After Lehman commenced its bankruptcy proceeding, a secondary marketplace emerged for the sale and purchase of claims against Lehman's estate.  Creditors of Lehman that do not wish to hold onto their claims for years while receiving intermittent, partial payments in the form of distributions from the estate's administrator, can instead assign those claims to sophisticated investors who are willing to wait out the liquidation proceedings.  Buyers make an upfront payment to the seller in return for the assignment of claim, with the purchase price representing a percentage of the claim's face amount.

19.     Typically, there is no guarantee as to how much a given claim will receive from the bankruptcy estate, which means there is a speculative quality to these transactions: the purchaser is taking a calculated risk that the distributions it ultimately receives from Lehman's estate will exceed the price the purchaser pays to acquire the claim, taking into account the time value of money.

20.     As with many types of securities transactions, sophisticated investors frequently discuss the terms of these types of trades via phone call and then formalize their agreement in one or more written contracts referred to as "trade confirmations."

21.     Then, following the execution of the binding trade confirmation(s), the parties cooperate in good faith to draft and execute whatever formal follow-on documentation is necessary before the parties can "settle the trade"—*i.e.*, transfer the seller's rights against Lehman's estate to the buyer in exchange for payment.

22.     This case involves a Trade in which Deutsche Bank and Defendants reached an agreement for the sale of claims against Lehman's estate, memorialized in the form of two written trade confirmations, only for Defendants to breach their express and implied obligations to Deutsche Bank by (i) unreasonably refusing to execute assignments of claim with Deutsche Bank on the terms agreed to by the parties and (ii) otherwise refusing to cooperate in good faith with Deutsche Bank to settle the Trade.

**B.  In Late 2018, Deutsche Bank and Defendants Began
Discussing a Transfer of Claims against Lehman's Estate**

23.     Defendant Finepoint is an investment manager based in Boston, Massachusetts, with approximately $4 billion in assets under management.  Defendants Warbler Run I and Warbler Run II are two limited liability companies that, upon information and belief, were created and controlled by Finepoint for the purpose of holding assets.

24.     At all times relevant to the below-described transactions, Deutsche Bank was interacting with officers and employees of Finepoint, whom Deutsche Bank understood to be acting on behalf of Finepoint, Warbler Run I, and Warbler Run II, collectively.

25.     Between October 31, 2018, and November 6, 2018, Finepoint and Deutsche Bank exchanged numerous phone calls and emails about a proposed transaction, pursuant to which Finepoint would acquire claims against Lehman's estate from Deutsche Bank.

26.     During these communications the parties discussed, among other things, the class and face amount of claims that Finepoint would be acquiring, and the dollar amount that Finepoint would pay to acquire these claims.

27.     The Deutsche Bank employees engaged in these discussions worked in New York, New York, throughout the relevant time-period.

28.     At the same time, Deutsche Bank was negotiating with another entity to acquire the

claims against Lehman's estate solely for the purpose of selling them to Defendants. The price Finepoint represented it would pay to purchase the claims from Deutsche Bank established the ceiling for how much Deutsche Bank was willing to pay to acquire those claims, and Deutsche Bank did not anticipate it would need to hold the claims on its books for more than a brief period in light of its expectation that it would assign the claims to Defendants.

29.     On a phone call on November 7, 2018, Deutsche Bank and Finepoint discussed the terms of the Trade, whereby Defendants would pay Deutsche Bank $14,677,200 in return for claims with a face amount of $906 million, divided up as follows:

   a.     $7,516,251.35 for an assignment of claims against Lehman's estate with a face amount of $463,966,133.00 to Warbler Run I LLC (the "Warbler Run I Transaction"); and

   b.     $7,160,948.65 for an assignment of claims against Lehman's estate with a face amount of $442,033,867.00 to Warbler Run II LLC (the "Warbler Run II Transaction," and collectively with the Warbler Run I Transaction the "Trade").

30.     The purchase price for the Trade represented 1.62% of the face amount of the claims to be assigned.

31.     On that same day, in reliance upon representations made by Finepoint, Deutsche Bank purchased the claims against Lehman's estate that were the subject of the Trade and that Deutsche Bank expected to assign to Defendants.

32.     As is customary, the next step in the process was for Deutsche Bank and Defendants to formalize the terms of the Trade in the form of written, jointly executed trade confirmations.

**C. Prior to the Execution of the Trade Confirmations, Deutsche Bank
   Disclosed Communications Exchanged with Lehman in Summer 2018**

33.     Immediately after the discussions with Finepoint on November 7, 2018, Deutsche

Bank became aware that it had not disclosed to Defendants the existence of certain communications that took place between Lehman and Deutsche Bank earlier that year and that concerned a claim that would be assigned in part to Defendants pursuant to the Trade:

a.    On July 23, 2018, Deutsche Bank had received a letter from Lehman, as the plan administrator for its own bankruptcy estate, regarding Claim No. 58233, for which Deutsche Bank was the record holder (the "Lehman Letter," a copy of which is attached hereto as Exhibit A).[1]

b.    In the Lehman Letter, Lehman claimed that this claim represented a "guaranty claim," that there was a corresponding "primary claim" against its estate, and that Lehman had supposedly overpaid on Claim No. 58233 by failing to credit itself for payments already made on that "primary claim."  Lehman then requested repayment from Deutsche Bank of the supposedly overpaid amount.  *See* Exhibit A.

c.    At the time the Lehman Letter was sent, Deutsche Bank and Lehman were engaged in an unrelated but high stakes dispute concerning hundreds of millions of dollars of Enhanced Capital Advantaged Preferred Securities ("ECAPS") issued by Lehman's London affiliate.  Deutsche Bank immediately recognized the Lehman Letter for what it was: a transparent, weak, and ultimately unsuccessful attempt to create leverage for use in the ECAPS dispute.

d.    Deutsche Bank promptly set up a phone call with Lehman—along with Deutsche Bank's and Lehman's outside counsel—to discuss the Lehman Letter.  That phone call took place on August 22, 2018.

---

[1]    While Deutsche Bank was identified as the record holder for Claim No. 58233, beneficial interests in the claim had been sold to other entities via participation, which is why Deutsche Bank had to reacquire those rights to sell to Finepoint, as described above.

e.    During the phone call, Deutsche Bank disputed Lehman's suggestion that the Claim No. 58233 was a "guaranty claim" capable of being reduced or limited by payments made on a related claim, but also ***repeatedly*** asked Lehman to clarify what "primary claim" it had supposedly uncovered that related to Claim No. 58233.  In response to this questioning, Lehman admitted ***it could not identify any such claim***.

f.    Also during the phone call, Deutsche Bank revealed to Lehman that Deutsche Bank had sold participations in virtually the entirety of Claim No. 58233 (*i.e.*, a legal right to share in any distributions) to other investors, such that, if Lehman pursued this meritless request for repayment and somehow prevailed, other creditors, rather than Deutsche Bank, would be the ones obligated to make the repayment.

g.    Lehman's evident disappointment upon hearing this news during the call, and Lehman's unwillingness to press the matter further after the call, confirmed Deutsche Bank's conclusion that the Lehman Letter was only sent to manufacture leverage for the ECAPS dispute, and that Lehman did not believe the request for repayment had merit.

h.    Following the August 22, 2018, phone call, Lehman ***never*** attempted to pursue the request for repayment, ***never*** sent any follow-up communications regarding this request, and ***never*** withheld any distributions on the supposedly already overpaid Claim No. 58233 based on the allegations made in the Lehman Letter.  In the nearly six years since the August 22, 2018, phone call, Lehman never again communicated with Deutsche Bank about this issue.

34.    For the reasons set forth above, it was clear from the moment the Lehman Letter was sent that it lacked any merit.  Therefore, it was immaterial to the Trade.  Nevertheless, out of

an abundance of caution, Deutsche Bank decided to make a full, frank, and immediate disclosure to Defendants of both the Lehman Letter and the August 22, 2018, phone call, and to do so ***before*** the parties executed written confirmations for the Trade.

35.     Therefore, within ***minutes*** of the November 7, 2018, agreement being reached, Deutsche Bank placed another phone call to Finepoint to: (i) bring the Lehman Letter to its attention, and (ii) schedule a conference call the next day between Deutsche Bank, Finepoint, and Deutsche Bank's outside counsel who had participated on the August 22, 2018, phone call with Lehman, to discuss these issues and answer any questions Finepoint might have.

36.     The Lehman Letter was no secret.  In fact, Lehman had publicly disclosed on its bankruptcy docket in September 2018 that it was intending to pursue supposedly overpaid "guaranty claims," and that "[i]nquiries have been delivered to [Deutsche Bank]" about such claims.  *See In re: Lehman Brothers Holdings, Inc.*, No. 1:2008-bk-13555, ECF No. 58829 (S.D.N.Y. Sept. 14, 2018).  And, during the follow-up phone call between Deutsche Bank and Finepoint described above, Finepoint acknowledged to Deutsche Bank that Finepoint was already aware, before November 7, 2018, that Lehman was making inquiries of this nature.

37.     During the November 8, 2018, conference call between Finepoint, Deutsche Bank, and Deutsche Bank's outside counsel, Finepoint did ***not*** express a belief that the Lehman Letter had any material relevance to the Trade and did ***not*** suggest that the disclosure of the Lehman Letter required the parties to revisit or renegotiate any terms discussed on November 7, 2018.

38.     In short, it was readily apparent that none of the parties considered the existence of the Lehman Letter to be material to their Trade.

**D.  On November 28, 2018, Defendants Signed the Trade
    <u>Confirmations with Full Knowledge of the Lehman Letter</u>**

39.     On November 13, 2018, Deutsche Bank signed two trade confirmations for the

Trade and sent them to Finepoint for its review and countersignature.

40.     On November 28, 2018, Finepoint's Chief Financial Officer executed and returned the two trade confirmations (the "Trade Confirmations").

41.     Consistent with the parties' November 7, 2018, discussions, the Trade Confirmations obligated Defendants to pay Deutsche Bank a total of approximately $14.6 million, in return for Deutsche Bank assigning to Warbler Run I and Warbler Run II claims against Lehman's estate with a total face amount of $906 million.

42.     As the next step before settling, the parties were required to execute assignments of claim.

**E. Defendants' Unreasonable Refusal to Execute Assignments of Claim that Reflected What the Parties Understood and Agreed at the Time of the Trade Confirmations**

43.     The Trade Confirmations provide that "[t]he settlement of this Transaction is subject to the execution and delivery of an Assignment of Claim Agreement ***reasonably acceptable*** to both Buyer and Seller."  Accordingly, neither party has the right to ***unreasonably*** refuse to execute an assignment of claim and settle the Trade.  But that is precisely what Defendants did next.

44.     As set forth above, the Trade Confirmations were executed by Defendants with full knowledge of both the Lehman Letter and Deutsche Bank's April 22, 2018, phone call with Lehman.  At no point between Defendants' disclosure of these communications on November 8, 2018, and Defendants' execution of the Trade Confirmations on November 28, 2018, did Finepoint raise any concerns about the Lehman Letter.

45.     However, following the execution of the Trade Confirmations, when the time came to draft and execute the assignments of claim, Finepoint began exploiting the existence of the Lehman Letter to try and turn this transaction into an all-upside scenario for Defendants, with

Deutsche Bank bearing all the risk.

46.     Specifically, Finepoint seized upon the fact that the Trade Confirmations: (i) included a statement that the "assignment of claim would contain [] customary representations, warranties, covenants, and indemnities, including, for the avoidance of doubt and without limitation, those previously provided by Seller in similar transactions," and also (ii) attached one such example of a "similar transaction[]" (which actually reflected a "Participation of Claim," not an assignment of claim), which included a representation, plainly inapposite to this transaction, that the "seller has not received any notice that the Participated Interest is void or voidable or subject to any disallowance, reduction, impairment or objection of any kind. . . ."

47.     Obviously, at the time the parties executed the Trade Confirmations, they all possessed actual knowledge that Deutsche Bank had received the Lehman Letter because Deutsche Bank had proactively and voluntarily disclosed that fact to Defendants.  Defendants therefore fully understood at the time they executed the Trade Confirmations that—when Deutsche Bank agreed it would make "customary representations, warranties, covenants, and indemnities" in the assignments of claim—Deutsche Bank was *not* agreeing to represent that it had not received the Lehman Letter, because that would be impossible.

48.     When Deutsche Bank provided Finepoint with draft assignments for its consideration and execution, it included a narrow carve out from that one representation that Deutsche Bank had never received notice of an "objection of any kind."  Consistent with the parties' understanding, Deutsche Bank agreed to a representation that acknowledged the existence of the Lehman Letter.

49.     Finepoint unreasonably declared that it was unwilling to execute the assignments on these terms, however, and insisted on holding Deutsche Bank to an alleged obligation to make

a *false* representation that it had not received notice of *any* objection to payment of the assigned claims, including the Lehman Letter.

50.     Presumably, Defendants realized the advantageous position they would be in if they were successful in this bad faith effort:  As set forth above, the acquisition of a claim against a bankruptcy estate is ultimately a speculative investment, with the buyer bearing the risk that the distributions on that claim may never exceed the purchase price that the buyer paid.  But if Defendants could compel Deutsche Bank to include a representation in the assignments that would be breached from day one, Defendants could then wait to see how their investment performed, and if at any time they were unhappy with the result, they could attempt to invoke the "breached" representation as a basis for compelling Deutsche Bank to unwind the transaction and repurchase the claims.  As a matter of law, however, Defendants' plan would not have worked, because the representation they were demanding Deutsche Bank include in the assignments would have been unenforceable.[2]

51.     Defendants' refusal to execute an assignment of claim unless it included a representation they knew to be false constituted a breach of both their express contractual obligation not to unreasonably refuse to sign an assignment of claim, and their implied contractual obligation to work in good faith with Deutsche Bank to achieve the purpose of the Trade

---

[2]     "Where a buyer closes on a contract in the full knowledge and acceptance of facts disclosed by the seller which would constitute a breach of warranty under the terms of the contract, the buyer should be foreclosed from later asserting the breach."  *Galli v. Metz*, 973 F.2d 145, 151 (2d Cir. 1992); *see also Rogath v. Siebenmann*, 129 F.3d 261, 265 (2d Cir. 1997) ("In short, where the seller discloses up front the inaccuracy of certain of his warranties, it cannot be said that the buyer—absent the express preservation of his rights—believed he was purchasing the seller's promise as to the truth of the warranties."); *Wells Fargo Bank N.A. v. Sovereign Bank, N.A.*, 44 F. Supp. 3d 394, 407 (S.D.N.Y. 2014) (granting motion to dismiss and for summary judgment on breach of contract claim where, "even assuming that defendant breached Rep 18, plaintiff waived the breach because it knew about and accepted the breach before entering into the contract").

Confirmations and settle the Trade.

52.     When Deutsche Bank made clear that it was unwilling to agree to Finepoint's unreasonable demand, Finepoint responded that it would only settle the Trade if Deutsche Bank would renegotiate the terms of the parties' agreements and agree to indemnify Finepoint on terms that Finepoint had never raised previously and were not consistent with market practice.

53.     Specifically, although the Trade Confirmations provided that the assignments need only contain "customary" indemnification language, Finepoint began demanding that Deutsche Bank agree to new and expansive indemnification language that would be unique to this Trade and was not something the parties had ever discussed prior to reaching a binding agreement in the form of the executed Trade Conformations.

54.     Deutsche Bank was under no obligation to entertain these unreasonable requests for new indemnification language, which were irreconcilable with what the parties had agreed to in the Trade Confirmations and did not afford a good faith basis for refusing to settle the Trade.

55.     For the avoidance of any doubt, Deutsche Bank stood ready and willing to settle the Trade by executing assignments of claims that reflected the parties' true understanding and agreement when they executed the Trade Confirmations, but was unable to do so because of Defendants' unreasonable refusal to enter into such assignments of claim and their unwillingness to cooperate with Deutsche Bank in a good faith effort to settle the Trade on the terms agreed.

**F.   <u>Deutsche Bank's Years-Long Attempts to Settle the Trade and Avoid this Litigation</u>**

56.     Over the past five years, Deutsche Bank and Finepoint have engaged in discussions during which Deutsche Bank acted in good faith to try to persuade Defendants to reconsider their position and execute assignments of claim that reflect what the parties actually agreed, so that the Trade can finally settle, to no avail.

57.     At this point, cognizant of the statute of limitations, Deutsche Bank is left with no

recourse but to commence this action, asserting claims for breach of contract and breach and of the implied covenant of good faith and fair dealing against Defendants.

58.     Deutsche Bank has been damaged by Defendants' refusal to settle the Trade. Deutsche Bank expended millions of dollars to acquire the claims at issue for the sole purpose of selling those claims to Defendants.  Defendants' breach of the Trade Confirmations left Deutsche Bank holding complex, long-term assets on its books that it had not expected to hold for more than a brief period.  As a result, Deutsche Bank has suffered damages including but not limited to out-of-pocket costs, administrative costs, lost opportunity costs, interest, and investment losses.

59.     These costs and losses, in an amount to be proven at trial, are the direct and proximate result of Defendants' breaches and are in the millions of dollars.  Deutsche Bank is entitled to be made whole for these losses.

## FIRST CAUSE OF ACTION

### (Against Finepoint and Warbler Run I)
### (Breach of Contract – Warbler Run I Transaction)

60.     Deutsche Bank repeats and realleges the allegations set forth in paragraphs 1 through 59, as though fully set forth herein.

61.     In November 2018, Deutsche Bank, Finepoint, and Warbler Run I entered into a contract for the sale of claims against Lehman's estate with a face amount of $463,966,133.00, in return for a purchase price of $7,516,251.35.

62.     This agreement was memorialized in a written Trade Confirmation that was fully executed by the parties on November 28, 2018.

63.     Pursuant to the Trade Confirmation, if presented with an assignment of claim that contained "reasonably acceptable" terms, Finepoint and Warbler Run I were obligated to execute that assignment of claim to settle the Warbler Run I Transaction.

64.     Finepoint and Warbler Run I breached this express contractual obligation by unreasonably refusing to execute an assignment of claim with Deutsche Bank unless the assignment contained (i) a false representation and warranty, and/or (ii) new and expansive indemnification language that was irreconcilable with the indemnification terms the parties had already agreed to in the Trade Confirmation and that are consistent with well-developed industry practice.

65.     Deutsche Bank fully performed its obligations under the Trade Confirmation, with the exception of any obligations it was unable to perform as a direct result of Finepoint's and Warbler Run I's failure to perform their own obligations.  Deutsche Bank stood ready and able to perform any such remaining obligations and would have done so but for Finepoint and Warbler Run I's material breaches rendering such performance impossible.

66.     Deutsche Bank was damaged as a direct and proximate result of Finepoint and Warbler Run I's breach of the Trade Confirmation for the Warbler Run I Transaction.

### SECOND CAUSE OF ACTION

**(Against Finepoint and Warbler Run I)**
**(Breach of the Implied Covenant of Good Faith – Warbler Run I Transaction)**

67.     Deutsche Bank repeats and realleges the allegations set forth in paragraphs 1 through 59, as though fully set forth herein.

68.     In November 2018, Deutsche Bank, Finepoint, and Warbler Run I entered into a contract for the sale of claims against Lehman's estate with a face amount of $463,966,133.00, in return for a purchase price of $7,516,251.35.

69.     This agreement was memorialized in a written Trade Confirmation that was fully executed by the parties on November 28, 2018.

70.     On its face, the Trade Confirmation envisioned that the parties would proceed to

collaboratively draft and execute an assignment of claim that would be consistent with what the parties had agreed in November 2018 and would allow each party to receive its bargained-for consideration.

71.     Finepoint and Warbler Run I were under an implied contractual obligation to act in good faith to achieve the purpose of the Trade Confirmation and not interfere with Deutsche Bank's ability to receive the benefit of the parties' bargain.

72.     Finepoint and Warbler Run I breached this implied duty of good faith and fair dealing by refusing to execute an assignment of claim or settle the Warbler Run I Transaction unless Deutsche Bank agreed to unreasonable conditions that were inconsistent with the parties' expectations at the time they executed the Trade Confirmation, and which—if Deutsche Bank had agreed to them—would have deprived Deutsche Bank of the benefit of the bargain.

73.     Furthermore, when Finepoint and Warbler Run I received the draft Trade Confirmation from Deutsche Bank on November 13, 2018, they *knew* that Deutsche Bank had received the Lehman Letter.  If Finepoint and Warbler Run I believed language in the draft Trade Confirmation could be interpreted as obligating Deutsche Bank to make a false representation that it had not received the Lehman Letter, and/or expected Deutsche Bank to agree to atypical indemnification language to address the Lehman Letter as a precondition to settling the Warbler Run I Transaction, then they had a good faith obligation to raise these issues *before* the parties executed the Trade Confirmation.  Finepoint and Warbler Run I breached that obligation by instead countersigning the Trade Confirmation as drafted, and then raising disputes about Deutsche Bank's obligations under the Trade Confirmation after-the-fact.

74.     Deutsche Bank fully performed its obligations under the Trade Confirmation, with the exception of any obligations it was unable to perform as a direct result of Finepoint and Warbler

Run I's failure to perform their own obligations. Deutsche Bank stood ready and able to perform any such remaining obligations, and would have done so but for Finepoint and Warbler Run I's material breaches rendering such performance impossible.

75.     Deutsche Bank was damaged as a direct and proximate result of Finepoint and Warbler Run I's breach of the implied covenant of good faith and fair dealing.

## THIRD CAUSE OF ACTION

### (Against Finepoint and Warbler Run II)
### (Breach of Contract – Warbler Run II Transaction)

76.     Deutsche Bank repeats and realleges the allegations set forth in paragraphs 1 through 59, as though fully set forth herein.

77.     In November 2018, Deutsche Bank, Finepoint, and Warbler Run II entered into a contract for the sale of claims against Lehman's estate with a face amount of $442,033,867.00, in return for a purchase price of $7,160,948.65.

78.     This agreement was memorialized in a written Trade Confirmation that was fully executed by the parties on November 28, 2018.

79.     Pursuant to the Trade Confirmation, if presented with an assignment of claim that contained "reasonably acceptable" terms, Finepoint and Warbler Run II were obligated to execute that assignment of claim to settle the Warbler Run II Transaction.

80.     Finepoint and Warbler Run II breached this express contractual obligation by unreasonably refusing to execute an assignment of claim with Deutsche Bank unless the assignment contained (i) a false representation and warranty, and/or (ii) new and expansive indemnification language that was irreconcilable with the indemnification terms the parties had already agreed to in the Trade Confirmation and that are consistent with well-developed industry practice.

81.     Deutsche Bank fully performed its obligations under the Trade Confirmation, with the exception of any obligations it was unable to perform as a direct result of Finepoint's and Warbler Run II's failure to perform their own obligations.  Deutsche Bank stood ready and able to perform any such remaining obligations and would have done so but for Finepoint and Warbler Run II's material breaches rendering such performance impossible.

82.     Deutsche Bank was damaged as a direct and proximate result of Finepoint and Warbler Run II's breach of the Trade Confirmation for the Warbler Run II Transaction.

## FOURTH CAUSE OF ACTION

**(Against Finepoint and Warbler Run II)**
**(Breach of the Implied Covenant of Good Faith – Warbler Run II Transaction)**

83.     Deutsche Bank repeats and realleges the allegations set forth in paragraphs 1 through 59, as though fully set forth herein.

84.     In November 2018, Deutsche Bank, Finepoint, and Warbler Run II entered into a contract for the sale of claims against Lehman's estate with a face amount of $442,033,867.00, in return for a purchase price of $7,160,948.65.

85.     This agreement was memorialized in a written Trade Confirmation that was fully executed by the parties on November 28, 2018.

86.     On its face, the Trade Confirmation envisioned that the parties would proceed to collaboratively draft and execute an assignment of claim that would be consistent with what the parties had agreed in November 2018 and would allow each party to receive its bargained-for consideration.

87.     Finepoint and Warbler Run II were under an implied contractual obligation to act in good faith to achieve the purpose of the Trade Confirmation and not interfere with Deutsche Bank's ability to receive the benefit of the parties' bargain.

88.     Finepoint and Warbler Run II breached this implied duty of good faith and fair dealing by refusing to execute an assignment of claim or settle the Warbler Run II Transaction unless Deutsche Bank agreed to unreasonable conditions that were inconsistent with the parties' expectations at the time they executed the Trade Confirmation, and which—if Deutsche Bank had agreed to them—would have deprived Deutsche Bank of the benefit of the bargain.

89.     Furthermore, when Finepoint and Warbler Run II received the draft Trade Confirmation from Deutsche Bank on November 13, 2018, they *knew* that Deutsche Bank had received the Lehman Letter.  If Finepoint and Warbler Run II believed language in the draft Trade Confirmation could be interpreted as obligating Deutsche Bank to make a false representation that it had not received the Lehman Letter, and/or expected Deutsche Bank to agree to atypical indemnification language to address the Lehman Letter as a precondition to settling the Warbler Run II Transaction, then they had a good faith obligation to raise these issues *before* the parties executed the Trade Confirmation.  Finepoint and Warbler Run II breached that obligation by instead countersigning the Trade Confirmation as drafted, and then raising disputes about Deutsche Bank's obligations under the Trade Confirmation after-the-fact.

90.     Deutsche Bank fully performed its obligations under the Trade Confirmation, with the exception of any obligations it was unable to perform as a direct result of Finepoint and Warbler Run II's failure to perform their own obligations.  Deutsche Bank stood ready and able to perform any such remaining obligations, and would have done so but for Finepoint and Warbler Run II's material breaches rendering such performance impossible.

91.     Deutsche Bank was damaged as a direct and proximate result of Finepoint and Warbler Run II's breach of the implied covenant of good faith and fair dealing.

## FIFTH CAUSE OF ACTION

**(Against All Defendants)**
**(Promissory Estoppel)**

92.     Deutsche Bank repeats and realleges the allegations set forth in paragraphs 1 through 59, as though fully set forth herein.

93.     Defendants made a clear and unambiguous promise to Deutsche Bank that they would pay Deutsche Bank $14,677,200 in exchange for claims against Lehman's estate with a face amount of $906 million.

94.     In reasonable reliance upon that promise, Deutsche Bank spent millions of dollars acquiring claims against Lehman's estate with a face amount of $906 million from a third party, for the sole purpose of selling those claims to Defendants.

95.     Defendants breached their promise to purchase the claims from Deutsche Bank, which left Deutsche Bank holding complex, long-term assets on its books that it had not expected to hold for more than a brief period and that it had expected to sell to Defendants for a promised price of $14,677,200.

96.     Deutsche Bank has suffered damages as a result of its reasonable reliance on Defendants' promise, including but not limited to out-of-pocket costs, administrative costs, lost opportunity costs, interest, and investment losses.

## SIXTH CAUSE OF ACTION

**(Against All Defendants)**
**(Indemnification)**

97.     Deutsche Bank repeats and realleges the allegations set forth in paragraphs 1 through 59, as though fully set forth herein.

98.     In November 2018, Deutsche Bank and Defendants entered into binding, written contracts in the form of the Trade Confirmations.

Case 1:24-cv-04567-JPC   Document 1   Filed 06/14/24   Page 21 of 22

99.     Pursuant to the Trade Confirmations, Defendants were obligated to execute assignments of claim with Deutsche Bank, in which they bound themselves to the "customary . . . indemnities" ordinarily agreed to by purchasers in transactions of this nature.

100.    If Defendants had complied with that obligation then Defendants would have been required to indemnify Deutsche Bank for, among other things, the fees, costs, and expenses Deutsche Bank has incurred and will incur from pursuing the present litigation to enforce Defendants' agreement to purchase the claims at issue for the agreed price and on the agreed terms.

101.    Accordingly, Deutsche Bank is entitled to indemnification of all fees, costs, and expenses it has incurred and will incur in order to enforce Defendants' obligations.

## PRAYER FOR RELIEF

WHEREFORE, Deutsche Bank prays for relief as follows:

1.      An award to Deutsche Bank of damages according to proof in an amount to be determined;

2.      For pre-and post-judgment interest at the maximum rate allowable by law;

3.      For Deutsche Bank's fees, costs, and expenses for pursuing this action; and

4.      For such other and further relief as the Court may deem just and appropriate.

## JURY TRIAL DEMAND

Deutsche Bank demands a jury trial in this action on all issues so triable.

Dated this 14th day of June 2024.          /s/ Michael S. Kraut
                                            Michael S. Kraut
                                            Email: michael.kraut@morganlewis.com
                                            Michael J. Ableson
                                            Email: michael.ableson@morganlewis.com
                                            Morgan, Lewis & Bockius LLP
                                            101 Park Avenue
                                            New York, NY 10178
                                            Telephone:  212.309.6000
                                            Facsimile:  212.309.6001

                                            *Counsel for Plaintiff Deutsche Bank AG, London Branch*